## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| JULIE A. SU, Acting Secretary of Labor, | ) | |
| United States Department of Labor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 20-CV-11450-AK |
| v. | ) | |
| | ) | |
| F.W. WEBB COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

**A. KELLEY, D.J.**

Plaintiff Julie Su, the Acting Secretary of the United States Department of Labor ("the "Secretary"), brings this action against Defendant F.W. Webb Company ("Webb") pursuant to the Fair Labor Standards Act of 1938 (the "FLSA"), as amended, 29 U.S.C. § 201 *et seq.*, asserting three claims for (1) misclassifying its Inside Sales Representatives ("ISRs") as exempt from overtime pay; (2) failing to maintain records of the hours each of their non-exempt employees worked; and (3) unlawfully retaliating against employees by dissuading them from speaking freely to the Secretary's investigators. [Dkt. 1 at ¶¶ 61-67]. The Secretary has moved for partial summary judgment on its overtime, recordkeeping, and retaliation claims. [Dkt. 63]. Webb has also moved for partial summary judgment as to the Secretary's retaliation claim. [Dkt. 60].

For the following reasons, the Secretary's motion for summary judgement [Dkt. 63] is **GRANTED IN PART** on the following issues: (1) Webb's ISRs are not administratively exempt under the FLSA; (2) Webb failed to pay its ISRs the premium required by the FLSA for

1

all overtime hours worked from August 4, 2018 to present; and (3) Webb violated the recordkeeping requirements of the FLSA.  The Secretary and Webb's motion for summary judgment [Dkt. 60; Dkt. 63] are both **DENIED** on the issue of whether Webb violated the anti-retaliation requirements of the FLSA.

## I.      FACTUAL BACKGROUND

In evaluating both motions for summary judgment, the Court relies upon the Secretary's statement of material facts in favor of its motion for partial summary judgment [Dkt. 65], Webb's response to those facts [Dkt. 68], and the Secretary's reply to Webb's response [Dkt 73]. It additionally incorporates Webb's statement of material facts in support of its motion for partial summary judgment [Dkt. 62] and the Secretary's response thereto [Dkt. 71].  Those facts admitted by each party are presumed true and those facts denied by each party, or raised only in rebuttal, are considered contested.

Webb is a wholesale company that sells plumbing, heating, cooling, PVF (pipes, valves, and fittings), industrial products, and related fixtures and equipment.  [Dkt. 65, Secretary of Labor's Statement of Material Facts ("Pl.'s SMF"), at ¶ 2].  Webb's principal business is making wholesale sales of those products to contractors in various industries, government organizations, institutions such as universities and hospitals, industrial buyers, and other customers who work in construction, building maintenance, and infrastructure.  [Id. at ¶ 5].  Webb generates its revenue from employees who directly sell the products to customers in the positions of inside sales, outside sales, and counter sales.  [Id. at ¶¶ 7-8].  Robert Mucciarone is Webb's Chief Operating Officer and manages Webb's overall operations.  [Id. at ¶ 12].  Ruth Martin is Webb's Senior Vice President of Human Resources and manages Webb's human resources department. [Id. at ¶ 13].  Webb's principal office is in Bedford, Massachusetts, but it operates over 100

storefront locations across nine different states including Massachusetts, Connecticut, Rhode Island, New Hampshire, Vermont, Maine, New York, New Jersey, and Pennsylvania.  [Id. at ¶¶ 1, 4].

### A.  Inside Sales Representatives

During the relevant period, Webb employed over 600 ISRs across nine states, more than the number of its outside salespersons or counter salespersons.  [Id. at ¶¶ 14, 19].  Throughout that time, Webb classified its ISRs as exempt administrative employees for the purposes of the FLSA.  [Id. at ¶ 15].  Webb generates revenue from its ISRs through the sales transactions that they complete with customers.  [Id. at ¶ 16].  Despite working in various product areas, Webb considers its ISRs to have the same position and basic duties.  [Id. at ¶ 18].  ISRs report to the general manager in charge of the store where they work, and in some stores, they may report to an inside sales manager in addition to the store's general manager.  [Id. at ¶ 20].  During the relevant period, at least some of Webb's ISRs worked more than 40 hours in at least some workweeks but were not paid the FLSA overtime premium for those additional hours.  [Id. at ¶¶ 21-22].

It is uncontested that the ISRs interact directly with Webb's customers throughout the sales transaction process, beginning with the customer's initial contact with an ISR and ending with the delivery of products that the customer purchases.  [Id. at ¶¶ 25-26, 28].  Webb has used two versions of the job description for an ISR during the relevant period.  [Id. at ¶ 33].  Job postings for open ISR positions are reviewed and approved by Webb's management, including by Ruth Martin in human resources, before they are distributed to potential candidates.

[Id. at ¶ 35].  One previous job description stated that "[p]revious sales experience [is]

preferred."  [Id. at ¶ 39].  A job posting for an ISR in March 2019, which is representative of

other job postings for the role, described the responsibilities as being to:

- process and maintain customer orders;
- create transfers between various F.W. Webb locations;
- attain specialty material through the use of purchase orders;
- meet and exceed sales and gp goals;
- effectively handle customer service issues;
- schedule and manage customer deliveries;
- produce bids for customer approval;
- manage credits to F.W. Webb standards; and
- other duties as assigned.

[Id. at ¶ 40].  ISRs do not work in any of the following areas: marketing, accounting, accounts

receivable, data governance, e-commerce, human resources, IT, or accounts payable.

[Id. at ¶ 29].

Webb's ISRs spend a minority of their time providing quotes on a specified parts list,

unlike its counter salespeople who primarily provide quotes and conduct sales transactions with

customers in stores.  [Dkt. 68, Defendant's Additional Disputed Material Facts ("Def.'s ADMF")

at ¶¶ 76-77].  Webb's counter salespeople are paid hourly and have no authority to deviate from

Webb's pricing matrix.  [Id. at ¶¶ 77, 79].

Webb views the unique role its ISRs play as part of what distinguishes it from its

competition.  [Id. at ¶ 81].  The company expects its ISRs to possess the knowledge and

expertise in their respective areas in order to advise their customers on the best solutions for their

needs.  [Id.].  Unlike counter salespeople, ISRs work closely with customers on specific projects

where the customer may not know the specific parts or items they need to meet their goals.  [Id.

at ¶ 87].  Another distinguishing factor is that while counter salespeople are bound by Webb's

pricing matrix and have no authority to deviate from it, ISRs do have discretion and authority on pricing and can go outside of the matrix's parameters.  [Id. at ¶ 79, 103].

While Webb hopes that its ISRs' interactions with customers will lead to a sale, even if they do not, Webb views the services its ISRs provide as promoting and preserving relationships with customers so that they will continue to do business with Webb.  [Id. at ¶ 83].  The ISRs are "Webb's eyes and ears on the marketplace."  [Id.].  ISRs are generally given the specifications and blueprints for a project, and then are asked to provide a quote for all the products needed to meet the specifications for that project based on Webb's inventory, items available in alternative places, and alternative products which could meet the requested specifications.  [Id. at ¶ 89].  In addition to finding products, ISRs work with Webb's customers on designs, application selection, and specification changes.  [Id. at ¶ 91].  When a customer needs a product that Webb does not stock, the ISRs will source the product based on their understanding of the customer's needs and the products on the market.  [Id. at ¶ 94].

Customers often consult with ISRs when preparing bids for projects to submit in response to a "Request for Proposal (RFP)."  [Id. at ¶ 95].  In these instances, ISRs help increase the competitiveness of those bids by helping to obtain a better price on the materials needed.  [Id.].  ISRs also support Webb's outside salespersons by addressing technical questions and providing information about the appropriateness of particular products.  [Id. at ¶ 98].  After an order is made, ISRs help track Webb's inventory, follow up on shipping status, interact with third-party manufacturers if necessary, and address customer concerns and complaints.  [Id. at ¶ 102].  In addition to these duties, ISRs provide general managers with information about competitors for the development of marketing strategies.  [Id. at ¶ 99].

ISRs receive annual performance appraisals from Webb, which are documented on a standard form.  [Pl.'s SMF at ¶ 43].  These are completed or approved by the general manager who supervises a particular ISR.  [Id. at ¶ 44].  The performance appraisal is divided into Section A, which looks to "Key Responsibilities," and Section B, which looks to "Behavioral Responsibilities" and "Opportunities for Growth."  [Id. at ¶ 47].  The manager performing the appraisal for the ISR assigns a rating based on the software metrics that Webb utilizes to track the activities of the ISRs during the sales process.  [Id. at ¶¶ 46, 48].

The Section A ratings are based on "Sales and GP Budget," "Bid & Bid Follow-Up," "Open Orders," and "Communication."  [Id.].  For "Sales and GP Budget," the ISRs are rated based on their overall sales and profits for the given year as compared to the sales and profits that Webb expected from them.  [Id. at ¶ 49].  The "Bid & Bid Follow-Up" portion is based on the number of bids, or quotes, that ISRs wrote for customers that year, the percentage of those bids that became completed sales, and their follow-up in regard to open bids that have not resulted in completed sales.  [Id. at ¶ 50].  The "Open Orders" portion evaluates ISRs on their efforts to act timely on bids that have opened on Webb's computer system but have not yet resulted in completed sales.  [Id. at ¶ 51].  Lastly, the "Communication" portion rates ISRs on the number of phone calls that were made to their direct lines and whether they were answered, as well as the outgoing calls they made during that year.  [Id. at ¶ 52].  Webb creates an "annual scorecard" featuring thirty sales metrics for each ISR which is then given to the manager responsible for completing their annual performance appraisal.  [Id. at ¶ 53].

ISR compensation is based on grade levels, which are determined by seniority and experience, and pay tiers within those grade levels, which are determined by performance as measured by the annual performance appraisal.  [Id. at ¶¶ 54-56].

During the relevant period, for its ISRs who worked outside of Maine, Webb did not use a timekeeping system to track the hours ISRs worked and did not keep complete records of the actual hours ISRs worked.  [Id. at ¶¶ 57-58].

### B.  The Secretary's Investigation

On October 2017, the Department of Labor's ("DOL") Wage and Hour Division initiated the investigation that gave rise to this lawsuit.  [Id. at ¶ 59; Dkt. 62, Defendant's Concise Statement of Material Facts ("Def.'s SMF") at ¶ 3].  The investigation was conducted by Jeannie Kruja and Nuno Montrond, the Division's Assistant Director, who participated in certain aspects of the investigation after March 2019.  [Id. at ¶¶ 1-2].  On December 29, 2017, Webb's counsel provided Kruja with a list of all current ISRs and requested that Kruja inform them of who they selected to interview so they could "give them a head's up [sic] and instruction to cooperate." [D's ADMF at ¶ 114].  The DOL first attempted to contact eighty-five Webb employees it believed were ISRs, and it obtained substantive responses from forty-eight of those employees. [Def.'s SMF at ¶¶ 4-5].

On three separate occasions, the Secretary mailed questionnaires and or letters to Webb employees, including ISRs.  [Pl.'s SMF at ¶ 60].  The first set was sent to approximately sixty employees on or about January 4, 2018.  [Id. at ¶ 61].  At least one ISR reported to his manager that he received a DOL message on January 9, 2018, before receiving any communications from Mucciarone, and thought the letter was spam.  [D's ADMF at ¶ 120].  When Webb became aware of that mailing from the DOL, they asked the Secretary's investigator to provide a list of names of the employees whom the Secretary had contacted in that mailing.  [Pl.'s SMF at ¶ 62]. The Secretary sent an email in response identifying the employees to whom the Secretary had

mailed the letters and questionnaires and additionally shared copies of the questionnaires and letters that the Secretary had sent to Webb's employees.  [Id. at ¶¶ 63-64].

Webb made employees available for Kruja to interview in person at several of its locations.  [D's ADMF at ¶ 108].  Kruja gave Webb advance notice of every location where she interviewed employees, and Webb personnel brought employees to the rooms where the investigators were stationed.  [Id. at ¶¶ 110-11].  As a result, Webb knew the identities of the employees interviewed at its locations.  [Id. at ¶ 112].

During the investigation, Mucciarone sent three different emails to Webb's employees about DOL's activities.  The first was sent on January 10, 2018, to the employees to whom the Secretary had sent its January 2018 mailing.  [Pl.'s SMF at ¶ 65].  That first email stated as follows:

> Folks,
>
> The Department of Labor is doing a random audit of Webb to assure that we are paying employees appropriately. The audit has been going on for a few weeks and we are in the final stages of it. They would like to speak to some employees with the job description of "Inside Sales". As a result you may be contacted or you may have already been contacted by phone or by letter. The DOL may ask you questions about your job which may include your hours of work, duties, your expertise, etc. …
>
> Webb is very comfortable that the audit will result favorably and so we encourage you to be forthcoming and honest. We wanted to let you know so that you would not be caught unaware and not know what to do. If you feel strongly that you do not want to participate that is ok too. But really there is no reason not to answer the questions.
>
> If they do contact you please let us know, so we can track how many employees have been asked to be interviewed. Any questions feel free to contact Ruth Martin or myself.
>
> Many Thanks,
> Bob

[Dkt. 60-6].

Prior to this, the Secretary had received responses from approximately fifteen to twenty of the employees who were contacted.  [Pl.'s SMF at ¶ 66].  After Webb requested access to the Secretary's materials in January of 2018, Kruja sent Webb the list of employees she had sent a contact letter or mail interview form to and provided Webb a copy of the letters as well. [D's ADMF at ¶¶ 116-117].

The Secretary mailed a second set of letters and questionnaires to a group of Webb employees on or around February 23, 2018, including ISRs.  [Pl.'s SMF at ¶ 67].  On February 28, 2018, after learning about the Secretary's second mailing, Mucciarone sent another email about the DOL's investigation to the employees whom Webb believed had been contacted or were about to be contacted by the Secretary.  [Id. at ¶ 68].  This email, which was sent to a listserv that included all of Webb's ISRs [Id. at ¶ 69], stated as follows:

> Ladies and Gentlemen,
>
> The Department of Labor audit continues. This is a random audit. It is performed to be sure we are paying employees correctly. We had thought we were in the final 5 stages weeks ago, but it appears more notifications may have gone out again. It appears they are still concentrating on inside sale [sic] positions.  I write this so you are not caught unaware should you receive a notification.
>
> Again, we fully expect that the audit will have a favorable result, so if you get a notification feel free to answer any questions honestly should you decide to participate and answer questions.  By no means are you compelled to answer and should you decide not to answer or participate, that is fine too.
>
> If you have been contacted, please let Ruth or myself know so we can track how many people have been contacted.  Any questions certainly contact either one of us.
>
> Many Thanks,
> Bob

[Dkt. 60-7].

Kruja said the response rate to the written questionnaires the DOL sent in January 2018 was "excellent" and that the response rate to the February 2018 written questionnaires was slightly lower but not noticeably low.  [Def.'s SMF at ¶ 15].

On March 8, 2019, the Secretary sent a third set of letters and questionnaires to twelve Webb employees.  [Id. at ¶ 16].  Those twelve employees included some that Kruja had contacted earlier in 2018 but who had not responded.  [Id. at ¶ 17].

On March 12, 2019, Mucciarone sent a third email about the Secretary's investigation to the employees whom Webb believed had been contacted or were about to be contacted by the Secretary as part of the investigation.  [Pl.'s SMF at ¶ 71].  This email was sent to a listserv that included all of Webb's ISRs and a listserv that included all employees in the estimator job category.  [Id. at ¶ 72].  The March 2019 email, which was the third and final email, stated as follows:

> Ladies and Gentlemen,
>
> The Department of Labor continues to audit how Webb pays it's [sic] employees. It is performed to be sure we are paying employees correctly. This has been going on for over a year. We had thought they were done and now we hear of more notifications going out to Webb employees. I write to you so you will be aware should you receive a notification. We feel we are in fact paying all of our employees as the law provides, and we do expect a favorable result when all is done. If you receive a notification, feel free to answer any questions honestly should you decide to participate. By no means are you compelled to answer any questions and should you decide not to participate and answer any questions that is entirely ok. Not to participate is your right.
>
> If you have been contacted, please let Ruth or myself know so we can track who has been contacted. Any questions certainly contact either Ruth or myself.
>
> Thank you,
> Bob

[Dkt. 60-8].

Webb asserts that Mucciarone sent these three emails because he wanted to keep track of the employees who spoke to the DOL. [Def.'s SMF at ¶ 19]. One reason offered for this was so that Webb could ascertain the information supplied by employees to the DOL. [Id.]. Webb asserts that Mucciarone also wanted to know what inquiries were made, whether there were any biases in the DOL's inquiries, and what the nature and magnitude of the investigation was in order to prepare Webb's defense in any subsequent litigation. [Id.].

The DOL received one or two responses to the approximately twelve interview requests it sent on March 8, 2019. [Id. at ¶ 21]. After Mucciarone's March 2019 email, Kruja noticed a lower response rate to the written questionnaires she sent than usual. [Id. at ¶ 22]. The week following Mucciarone's March 2019 email, Kruja allegedly received between five and six "unidentified voice messages from Webb employees who stated that Webb was keeping a list of workers who spoke to Investigator Kruja and requested Investigator Kruja stop contacting them." [Id. at ¶ 23]. Kruja deleted those unidentified voicemails at some point when her voicemail mailbox was full. [Id. at ¶ 24]. Kruja and the DOL did not preserve or make any record of those voicemails. [Id. at ¶ 27]. No one apart from Kruja listened to the voicemails. [Id. at ¶ 28]. The DOL further alleges that Kruja spoke to two anonymous Webb employees who refused to participate in the investigation because they were troubled by the fact that Webb was allegedly keeping a list of workers who spoke to the investigators. [Id. at ¶ 29]. At least one of those workers was an ISR. [Id. at ¶ 30]. Neither referenced the Mucciarone emails in their statements. [Id.].

Kruja spoke to two additional Webb employees who believed their communications with the DOL were being tracked and who were informed by more senior employees at Webb that they could suffer consequences for participating in the investigation. [Id. at ¶ 31]. During a visit

to a Northern Massachusetts Webb location, Montrond interviewed two employees in person. [Id. at ¶ 32]. One of the Webb employees reported that he had seen Mucciarone's March 2019 email and was not concerned by it. [Id. at 33]. The other was reportedly uncomfortable during the interview and was reluctant to provide Montrond a copy of Mucciarone's March 2019 email. [Id. at ¶ 34]. That employee had not been contacted by the DOL prior to the interview. [Id. at ¶ 35]. He did eventually provide a copy of the email via a photo taken on his phone that he shared via text. [Id. at ¶ 36]. In April 2019, the DOL learned of the existence of the emails sent by Mucciarone in January 2018 and February 2018. [Id. at ¶ 38].

The Secretary initiated this action on July 31, 2020. [Dkt. 1]. During discovery, Webb sought to compel production of redacted portions of the documents that the Secretary had provided them. [Dkt. 40 at 4]. Those redactions withheld details, including names, about the employees whom the Secretary interviewed during its investigation, under the informer's privilege. [Id.]. The Court denied Webb's request, in part because of the policy considerations in favor of protecting the anonymity of informants until shortly before or during a trial. [Dkt. 59].

After the conclusion of discovery, Webb filed a partial summary judgment motion [Dkt. 60], which was in turn opposed by the Secretary. [Dkt. 70]. The Secretary filed its own motion for partial summary judgment [Dkt. 63], which Webb has opposed [Dkt. 67]. Following the submission of additional briefing as to both motions for summary judgment, the Court held a motion hearing in March 2023 before taking the matter under advisement.

## II.  LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816,

822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law.  Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted).  The Court must consider (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law."  Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).  Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving parties."  Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183–84 (1st Cir. 1999)).  A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists."  Paul, 948 F.3d at 49 (citation omitted).  Where, as here, the Court is deciding on cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn."  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).  The Court "may enter summary judgment only if the record, read in this manner, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Hevia, 602 F.3d at 40 (internal citations omitted).

## III.    DISCUSSION

The Secretary argues that it is entitled to summary judgment on its overtime and recordkeeping claims because: (1) Webb did not pay ISRs an overtime premium for the overtime hours they worked; (2) Webb admits it did not keep time-keeping records for its ISRs; and (3) Webb cannot meet its burden to prove that the ISRs are exempt under the FLSA's administrative exemption.  [Dkt. 64 at 9].  Webb counters that summary judgment is inappropriate here because there exists a genuine issue of material fact as to the primary duties of the ISRs which is necessary to resolve before determining whether the administrative exemption applies. [Dkt. 67 at 1].

The Secretary further argues that it is entitled to summary judgment on its retaliation claims because the emails were sent to employees engaged in protected activity in a manner that would have dissuaded a reasonable employee from speaking freely to the Secretary.  [Dkt. 64 at 17-18].  Webb argues that it should be granted summary judgment instead on the Secretary's retaliation claim because the Secretary cannot make a prima facie case of unlawful retaliation under the FLSA, as no Webb employee experienced adverse action and because Webb had legitimate, non-retaliatory reasons for sending its emails.  [Dkt. 61 at 9-10, 17].

**A. Overtime and Timekeeping**

The critical question regarding the Secretary's overtime and recordkeeping claims is whether the administrative exemption of the FLSA applies to the ISRs.  The Secretary argues that the ISRs are ineligible for the administrative exemption because their primary duty is to produce sales, Webb's principal business is producing sales, and the ISRs are not predominately engaged in administrative work.  [Id. at 12-16].  Webb responds that the ISRs are covered under the administrative exemption because their primary duty is providing solutions to Webb's

customers, they help develop strategy, and they enjoy broad discretion and authority on matters of significance as part of their role.  [Dkt. 67 at 11-15, 17].

Under the FLSA, when employees work longer than forty hours during the workweek, their employer is obligated to pay them at a rate not less than one and one-half times their regular rate.  29 U.S.C. § 207(a)(1).  An employer is liable for the failure to pay overtime wages if they have actual or constructive knowledge of overtime work performed.  Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013).  When an employee is covered by the FLSA's overtime requirements, the employer is obligated to keep records tracking the hours that employee spent working.  29 C.F.R. § 516.2(a).

The FLSA's overtime requirements have exemptions, including for employees in a "bona fide . . . administrative" role.  29 U.S.C. § 213(a)(1).  In determining the parameters of these exemptions, the Court looks to the Secretary of Labor's regulations.  Cash v. Cycle Craft Co., 508 F.3d 680, 683 (1st Cir. 2007).  While these regulations "merely state the Secretary's official position on how the statutes should be interpreted," the Court must give them "controlling weight unless [the court finds them] to be arbitrary, capricious, or contrary to the statute."  Id. (quoting John Alden, 126 F.3d at 8).  These exemptions are to be given a fair, rather than narrow, interpretation.  Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018).

According to the Secretary of Labor's regulations clarifying the FLSA, an employer must prove that the administrative exemption applies by demonstrating that its employees are:

> (1) compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week;
>
> (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

> (3) whose primary duty includes the exercise of discretion and
>       independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  The employer bears the burden of establishing that each of the three

elements apply.  John Alden, 126 F.3d at 7-8.  The first element here is not in dispute.  [Dkt. 67

at 9 n.5].

The First Circuit has recently clarified that to meet the second element under the

administrative exemption test, a "relational" analysis is required.  Walsh v. Unitil Serv. Corp., 64

F.4th 1, 5 (1st Cir. 2023).  This requires courts to examine the employee's primary duty.  The

primary duty is the main, or most important, duty, that the employee performs and "generally

means that the employee spends at least 50% of his or her time performing the duty."  Id.  If the

primary duty is "directly related" to the "management or general business operations of the

employer," the second element is satisfied and the employee may meet the administrative

exemption.  Id. (quoting 29 C.F.R. § 541.200(a)).  To meet that requirement, "an employee must

perform work directly related to assisting with the running or servicing of the business, as

distinguished, for example, from working on a manufacturing production line or selling a

product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Conversely, if the

employees' primary duty relates to their employer's business purpose, "in that they produce the

product or provide the service that the company is in business to provide," the administrative

exemption cannot apply.  Unitil Serv. Corp., 64 F.4th at 7.  To determine an employer's business

purpose, courts may look at what the "product or service [is] that the employer or its customers

offers to the public."  Id. at 6 (quoting John Alden, 126 F.3d at 9).  In other words, the Court,

when employing the relational analysis, examines whether an employee's primary duties are

focused on carrying out the business's "principal production activity" or on other "ancillary"

matters related to the business's overall operations and management.  Id. at 7.  Those in the latter category may qualify for the exemption while those in the former cannot.

In Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903-05 (3d Cir. 1991), the Third Circuit concluded that inside salespersons at a wholesale business had the primary duty of "producing" sales and thus were non-exempt "production" employees rather than "administrative" employees.  Cooper Electric's primary business was selling electrical products, and its inside salespersons spent the majority of their time making telephone sales of electrical products.  Id. at 899, 902.  Some of the tasks those inside salespersons were responsible for included negotiating with manufacturers and customers over pricing and product purchases.  Id. at 904.  The Third Circuit found that this did not alter its conclusion, as those activities could not be characterized as "servicing of Cooper's Business" and were instead "part and parcel" of the activity of "producing sales."  Id. at 904.  The fact that the inside salespersons advised customers on which additional products to purchase was considered a supplement to their sales work.  Id. at 905.

Webb's business purpose is to produce wholesale sales of its products to its customers. [Pl.'s SMF at ¶ 5].  The company generates its revenue from the sale of its products via its salespersons, including its ISRs.  [Id. at ¶¶ 7-8].  Since the ISRs' primary duty closely relates to Webb's business purpose, "in that they produce the product or provide the service that the company is in business to provide," Webb cannot meet the second prong of the administrative exemption test.  See Unitil Serv. Corp., 64 F.4th at 7.  In other words, Webb's business purpose is to sell Webb's products, and the ISRs' primary duty is to help sell Webb's products.  See Cooper Elec., 940 F.2d at 904.

Even if it accepts Webb's characterization of the ISRs' primary duty, a reasonable jury would be unable to determine that the ISRs' work relates to Webb's management or general business operations.  Webb asserts that the most important function ISRs serve is to "create solutions for its customers" and that its ISRs' primary duty relates to advising customers on product selection, assisting customers with ongoing projects, advising customers on design and specifications, assisting customers in preparing proposals, and formulating Webb's sales strategy by providing general managers with information about competitors.  [D's ADMF at ¶¶ 23, 24, 28(g), 30, 81-83, 86-88, 90-91].  Yet ISRs only partake in all of these activities, especially the customer facing work, in order to facilitate the sale of Webb products.  See Cooper Elec., 940 F.2d at 904.  As in Cooper Elec., the ISRs here all make discrete sales, and thus their work is not akin to the more administrative role of promoters or marketers who work to promote sales generally.  Id. at 905.

Webb asserts that it employs ISRs in order to differentiate itself from its competitors by having its ISRs provide a higher level of service, such as by helping customers determine which combinations of equipment, systems, and products would enable them to meet their needs. [D's ADMF at ¶ 82].  Therefore, even under Webb's own characterization, the reason they employ ISRs is to better help customers buy the Webb products they need.  The fact that ISRs bring with them knowledge and expertise, and are allowed to exercise discretion in setting pricing, does not transform the sales-focused function of their role.  See Cooper Elec., 940 F.2d at 903-04, 906.

Even the job title of Inside Sales Representative underscores that the reason Webb employs its ISRs is to sell their products.[1]  The original job description included "previous sales experience" as a qualification for the role.  [Pl.'s SMF at ¶ 39].  In the job description used to hire ISRs in March 2019, which was reviewed and approved by Webb's management, nearly all the responsibilities it describes relate to various steps an ISR would need to complete in order to finalize sales of Webb products.  [Id. at ¶¶ 35, 40].

The Court also reaches this conclusion because sales performance is central to how Webb evaluates the job performance of its ISRs.  The general managers who supervise the ISRs look at the individual ISR's sales and profits, the number of bids written for customers and the percentage of those bids that became completed sales, and data about the number of phone calls made to the ISR's phone line.  [Id. at ¶¶ 49-53].  The ISRs' performance as based on those metrics determines the pay tiers into which Webb places its ISRs.  [Id. at ¶¶ 54-56].  Webb makes clear that its ISRs do more than simply take orders.  [D's ADMF at ¶ 99].  They may advise management on strategy or work to improve relationships with customers.  But ISRs are ultimately valued and compensated for their ability to assist customers in purchasing Webb's products.

Webb's ISRs assert that they spend much more time on helping customers, doing in-depth research on their needs, and finding the associated available products than on completing orders.  [Dkt. 69-1 at ¶ 7; 69-2 at ¶ 8; 69-3 at ¶¶ 7-8; 69-4 at ¶ 14; 69-5 at ¶ 6; 69-6 at ¶ 6; 69-7 at ¶ 6, 13-15; 69-8 at ¶ 7; 69-9 at ¶ 13; 69-10 at ¶ 14].  Be that as it may, the goal of their research is to provide customers information about which Webb products they should purchase.  See

---

[1] The particular job title given to an employee is not determinative, as it is the duties and responsibilities that determine whether an employee qualifies as exempt. John Alden, 126 F.3d at 10.  However, here, the ISRs' job title is a reflection of their duties and responsibilities, which is primarily to help get Webb sell Webb products.

Cooper Elec., 940 F.2d at 904.  These ISRs may be experts, but they are experts whose primary function is helping to sell Webb products.  This logic applies equally to the work ISRs do to help customers even when sales do not occur.  [See D's ADMF at ¶ 83].  While Webb hopes that a byproduct of the ISRs' giving advice may be that it promotes and preserves relationships with future customers, the ISRs' primary intention for giving that advice is for it to lead to sales. [See id.].

Webb argues that Cooper Electric is inapposite here because the inside salespersons there played a different, more circumscribed, role, whereas its ISRs provide advice, gather facts, and build relationships with customers.  [Dkt. 67 at 12-15].  While there may be differences between the *scope* of the two roles, there is not a significant difference in the *purpose* that the inside sales representatives serve.  Even though they may have greater responsibilities and expertise, Webb's ISRs' primary duties are still closer to Webb's principal function of selling Webb's products than to the ancillary duties related to the running or servicing of the business. See Unitil Serv. Corp., 64 F.4th at 7.

This is also why Webb's analogy to the marketing representatives in John Alden fails. 126 F.3d at 7-10.  In John Alden, the company, John Alden, worked on "designing, creating, and selling insurance policies."  Id. at 9.  The marketing representatives' primary duty was to promote John Alden's insurance policies to independent insurance agents who then sold them, as well as the insurance policies of John Alden's competitors, to members of the general public.  Id. at 4.  Unlike the ISRs here, the marketing representatives therein worked to promote customer sales "*generally*" rather than working on particular sales transactions.  Id. at 10 (emphasis in original).  This aligned the activities of the marketing representatives more with servicing the business than with John Alden's principal production activity, which was the creating and selling

of insurance policies.  Id.  Similarly, in Cash v. Cycle Craft Company, Inc., 508 F 3d 680, 686

(1st Cir. 2007), the primary duty of a Harley-Davidson employee was considered related to

management because he was responsible for improving customer satisfaction *generally*.

(emphasis added).  The plaintiff therein coordinated various Harley-Davidson departments to

ensure that the motorcycles purchased were properly outfitted and delivered, and that customers

were providing positive feedback reports.  Id.  These comparisons differ significantly from the

role the ISRs play here.  The employee in Cash was not involved in the sale of the motorcycles.

Id. at 681-82.  Here, however, Webb's ISRs' primary duty of helping customers buy Webb

products is "directly related" to Webb's business purpose of making wholesale sales of its

products, and their work is not related to increasing sales generally.  See Unitil Serv. Corp., 64

F.4th at 4.

> The facts presented here, even after drawing all reasonable inferences therefrom in the
> light most favorable to Webb, do not create a genuine issue of material fact.  Webb may be able
> to add context to the ISRs' role, but that would not change their function.  On their claim that the
> ISRs do not qualify for the FLSA's administrative exemption, the Secretary is entitled to
> judgment as a matter of law.  As a result, the Court also grants summary judgment for the
> Secretary on Webb's failure to pay its ISRs the premium required by the FLSA for all overtime
> hours worked from August 4, 2018, to present, and on Webb's violation of the recordkeeping
> requirements of the FLSA.

### B. Retaliation

> Both parties move for summary judgment on the retaliation claim.  The Secretary asserts
> it is entitled to summary judgment because it is undisputed that the employees who received the
> emails from Mucciarone were engaged in the protected activity of providing the Secretary

information; that the emails were sent to employees who Webb knew were about to speak to the DOL; and that the timing, tone, and content of the emails might well have dissuaded a reasonable Webb employee from speaking freely to the Secretary.  [Dkt. 64 at 17-24].  The Secretary argues that an employee complying with Mucciarone's email request would be forced to give up their right to speak to the Secretary confidentially.  [Id. at 21-22].  The Secretary further asserts that a reasonable employee would be less likely to speak to the Secretary after being told in the emails that Webb was tracking who was being contacted.  [Id. at 22].  Webb argues it is entitled to summary judgment on the Secretary's retaliation claim because no Webb employee experienced any adverse employment action; the Secretary does not provide evidence to show that employees were deterred from participating; the full context of the emails does not demonstrate retaliatory action; and the emails were sent for nondiscriminatory reasons. [Dkt. 61 at 10-18].

The goal of the FLSA is to prohibit "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 11 (2011) (quoting 29 U.S.C. § 202(a)).  The FLSA relies on workers being able to freely report violations of the law in order for its enforcement to be effective.  To enforce its standards, the FLSA relies not upon "continuing detailed federal supervision or inspection of payrolls," but upon "information and complaints received from employees seeking to vindicate rights claimed to have been denied."  Id. (internal citations omitted).  Effective enforcement thus depends on employees feeling "free to approach officials with their grievances." Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 292 (1960).  The FLSA's anti-retaliation provision enables enforcement by preventing the "'fear of economic retaliation' . . . [from] inducing workers 'quietly to accept substandard conditions.'" Kasten, 563 U.S. at 11 (quoting Mitchell, 361 U.S. at 292).

Section 15(a)(3) of the FLSA prohibits "any person" from "discriminating against any employee" for engaging in activity protected under the FLSA.  29 U.S.C. § 215(a)(3).  To prevail on its retaliation claim, the Secretary must prove that: (1) an employee engaged in conduct protected by the FLSA; (2) the employer or another person subjected the employee to an adverse action; and (3) the adverse action was taken because of the protected conduct.  Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 531 (1st Cir. 2015).

### 1. Protected Conduct

The employees Webb emailed were engaged in protected conduct when they participated in the investigation or planned to provide information to the DOL officials conducting the investigation.  29 U.S.C. § 215(a)(3) (prohibiting discrimination against any employee "who has testified or is about to testify in any such proceeding"); Kasten, 563 U.S. at 14 (holding that oral complaints are protected so long as they clearly make "an assertion of rights protected by the statute and a call for their protection"); Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 103 (1st Cir. 2004) (noting that an employee is not required to file a formal complaint to receive protection under FLSA but is required to take some kind of action); Miller v. Metro Ford Auto. Sales, Inc., 519 F. App'x 850, 851 (5th Cir. 2013) (noting that the FLSA prohibits employers from discriminating against an employee for "participating in investigations or other proceedings"); Bowen v. M. Caratan, Inc., 142 F. Supp. 3d 100, 1023 (E.D. Cal. 2015) (holding that a reasonable jury could find that an employee whom the DOL was planning to interview was "about to testify").

Here, Mucciarone sent the emails either when Webb's ISRs had already "testified" or were "about to testify" through their participation in the Secretary's investigation.  29 U.S.C. § 215(a)(3); Kasten, 563 U.S. at 13 (finding that FLSA should be interpreted similar to the

National Labor Relations Act ("NLRA"), whose antiretaliation provision "protect[s] workers who neither filed charges nor were 'called formally to testify' but simply 'participate[d] in a [National Labor Relations] Board investigation'"); <u>Bowen</u>, 142 F. Supp. 3d at 1023; <u>Uronis v. Cabot Oil & Gas Corp.</u>, 49 F.4th 263, 274 (3d Cir. 2022) (finding that to "testify" includes the filing of an informational statement with a government entity, and that in order to enable the FLSA's enforcement, "about to testify" under Section 15(a)(3) is to be given broad rather than narrow interpretation).  Each email was sent shortly after the Secretary sent out its questionnaires and letters.  [Pl.'s SMF at ¶¶ 61-65, 67-72].  Webb was aware that at least some of the employees already had or were about to provide information to the Secretary's investigators when Mucciarone sent the emails.  [<u>Id.</u> at ¶¶ 63, 68, 71].  Furthermore, Webb does not dispute that its employees were engaged in protected activity when speaking with the DOL's investigators.  As such, Webb's employees were engaged in protected activity when the allegedly adverse action occurred.

## 2.  Adverse Action

In addressing the second and third elements, the Court must evaluate whether Mucciarone's emails, and their surrounding context, constitute "adverse action."  The standard for determining whether an act rises to that level is an objective one.  <u>See</u> <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 55 (2006) (emphasizing, in the context of a Title VII retaliation claim, that the standard for evaluating whether harm has occurred is objective); <u>Lockridge v. The Univ. Of Maine Sys.</u>, 597 F.3d 464, 472 (1st Cir. 2010) (describing test for materially adverse action as "objective," which "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances" (quoting <u>Burlington N.</u> at 71)); <u>Booker v. Mass. Dep't of Pub. Health</u>, 612 F.3d 34, 43 (1st Cir. 2010)

("[W]hether an action is materially adverse is judged by an objective rather than a subjective standard."); Serapion v. Martinez, 119 F.3d 982, 985 (1st Cir. 1997) ("We regard Title VII . . . . and FLSA as standing in *pari passu* and [treat] judicial precedents interpreting one such statute as instructive in decisions involving another."); Scalia v. F.W. Webb Co., No. 20-CV-11450-ADB, 2021 WL 1565508, at *4 (D. Mass. Apr. 21, 2021). Although the standard is objective, it is articulated in "general terms" because the "significance of any given act will often depend on the particular circumstances" and context. Burlington N., 548 U.S. at 69 (citing Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81-82 (1998)). An "act that would be immaterial in some situations is material in others." Id.

The Secretary asserts that the emails constituted adverse action because they forced Webb's workers into a dilemma, depriving some employees of their right to keep their participation confidential while discouraging others from participating at all. [See Dkt. 64 at 19-23]. The emails, the Secretary argues, would therefore have dissuaded a reasonable employee in the ISRs' position from speaking freely to the investigators.

An act taken by an employer that would discourage its employees from participating in a DOL investigation can be considered materially adverse. See F.W. Webb Co., 2021 WL 1565508, at *5; Booker, 612 F.3d at 44 (finding that a jury instruction which stated that discouraging complaints about unlawful practices constituted adverse action under Burlington N. was not clearly erroneous); Figueroa v. Cactus Mexican Grill LLC, 575 F. Supp. 3d 208, 217-18 (D. Mass. 2021) (holding that discouraging plaintiff from participating in DOL investigation through threats of termination plausibly stated a claim for retaliation under FLSA); Trant v. Murray, 589 F. Supp. 3d 50, 58 (D.D.C. 2022) (stating that a reasonable jury could find that discouraging employee from filing complaint constitutes a materially adverse action); McBurnie

v. City of Prescott, 511 F. App'x 624, 625 (9th Cir. 2013) (holding that a reasonable jury could

find that an employer surveilling an employee and singling them out for complaining about their

overtime policy could, among other actions, constitute adverse action); Fallon v. Potter, 277 F.

App'x 422, 428 (5th Cir. 2008) (holding that a genuine issue of material fact existed as to

whether comments discouraging an employee from filing complaints by emphasizing the futility

of doing so might have dissuaded a reasonable employee from pursuing their claims).[2]

Here, because there is a material dispute as to whether the emails could have had such an

effect, summary judgment is inappropriate.  The emails were received shortly after the DOL's

investigators contacted Webb employees, when those employees would be considering whether,

and to what extent, they wanted to participate in the investigation.  [Pl.'s SMF at ¶¶ 61-65, 67-

72].  Having been sent by the highest levels of management, the emails would have commanded

a line employee's attention.  [Id.].  Each of the three emails concluded with a statement like "[i]f

you have been contacted, please let Ruth or myself know so we can track how many people have

been contacted."  [Dkt. 60-6; Dkt. 60-7; Dkt. 60-8].  If read as a directive, this would force

employees to choose between giving up the confidentiality of their communications or

disobeying an order from upper management.  The former could deprive employees of their

ability to speak freely to the DOL.  This is underscored by the fact that the purpose offered by

---

[2] Webb highlights the fact that the Court in Burlington N. stated that the antiretaliation provision does not protect
employees from all retaliation, only that which produces an injury or harm.  548 U.S. at 67.  Webb argues that
because there is no demonstration of harm here, no reasonable employee could find the actions adverse. [Dkt. 61 at
11].  The decision in Burlington N. draws a distinction between harm that is trivial and harm that is "materially
adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a
charge of discrimination.'" 548 U.S. at 68. (internal citations omitted). Since the emails, as well as the surrounding
context, may have dissuaded a reasonable employee from participating in the investigation, they can be considered
materially adverse under the standard articulated in Burlington N.  See id.  Stated another way, Webb's argument
fails here because being dissuaded from participating in an investigation is a harm in and of itself that is sufficient to
be characterized as retaliation.  See e.g., F.W. Webb Co., 2021 WL 1565508, at *5; Booker, 612 F.3d at 44;
Figueroa, 575 F. Supp. 3d at 217-18; Trant, 589 F. Supp. 3d at 58; Fallon, 277 F. App'x at 428.

Mucciarone for sending the emails included discovering the information supplied by employees to the DOL.  [Def.'s SMF at ¶ 19].  A reasonable employee may have hoped to keep the details of what they told the DOL investigators confidential, especially if they were critical of management.[3]  However, an employee disobeying a directive could reasonably perceive that they were risking employment consequences by doing so.  Such a predicament could dissuade a reasonable employee from exercising their rights to participate.[4]  Webb's statement about its desire to "track" how many and who of its employees were contacted further underlines the predicament the emails may have created.[5]  [Id.].  Summary judgment is inappropriate for Webb here, because the timing, tone, content, and stated justifications for the emails could persuade a reasonable jury that the emails sent by Webb management during the investigation constituted retaliation.

---

[3] Defendant argues that the employee's informer's privilege does not create a bar to an employer who seeks to learn about the scope and character of a governmental investigation.  [Dkt. 76 at 3-6].  The employee's informer's privilege protects the Secretary from disclosing the identity of its witnesses or the information provided by witnesses during discovery.  Brock v. J.R. Sousa & Sons, Inc., 113 F.R.D. 545, 546 (D. Mass. 1986).  The privilege, which is qualified, is held by the Government.  Roviaro v. United States, 353 US 53, 59 (1957).  Defendant's argument conflates separate issues, namely the ability of the DOL to keep the names of its informers secret and the ability of employees to speak freely with and express grievances to DOL officials.  The informer's privilege governs the former. The legal protection underpinning the latter is the FLSA, whose enforcement depends on employees being able to approach officials with their grievances, and its antiretaliation provision, which protects the employees who do so.  See Mitchell, 361 U.S. at 292; 29 U.S.C. § 215(a)(3).  It is not the case that Defendant can take no action to protect itself, to conduct its own investigation, or to speak with its employees about how they should conduct themselves when contacted by investigators.  It is the case, however, that it is impermissible for an employer to act in a manner that would dissuade a reasonable employee from exercising their rights, including their rights to participate in an investigation, under the FLSA.  See F.W. Webb Co., 2021 WL 1565508, at *5.

[4] Webb argues that the emails, which contain statements like "feel free to answer any questions honestly," could not have discouraged participation. [Dkt. 76 at 2-3].  While employees may have taken that instruction into consideration, the remainder of the emails, including the instruction to disclose participation, could have impacted a reasonable employee's decision to participate.

[5] Webb's emails could also be perceived as escalating in tone.  The earlier emails include encouragement to participate honestly while the third email does not.  Notably, while the first two emails ask employees to let management know if they heard from investigators in order to "track how many employees have" been contacted, and the final email asks employees to let management know "so we can track *who* has been contacted." [Dkt. 60-6; Dkt. 60-7; Dkt. 60-8 (emphasis added)].  Whether that difference, or the suggestion of "tracking," would be sufficient to dissuade an employee from participating is a material dispute of fact.

At the same time, a reasonable jury could, in assessing the surrounding context, reach the opposite conclusion.  The emails, when read in full, could be perceived as benign.  In addition to notifying employees about the existence of the investigation, about which there was some confusion [D's ADMF at ¶ 120], the first two emails encouraged employees to be forthcoming and honest with investigators.  [Dkt. 60-6; Dkt. 60-7].  The third email omits this encouragement but does not directly discourage participation either.  [Dkt. 60-8].  While there was a lower response rate than usual to the third mailing, with only one or two employees responding, that mailing was sent to around twelve employees, in particular to those who had previously not participated.  [Def.'s SMF at ¶¶ 17, 21-22].  At least one employee who received the March 2019 email and reported he was not concerned by it.  [Id. at 33].

There is a material dispute of fact as to whether the employees would perceive the emails, and their surrounding context, as depriving them of their ability to participate in the investigation confidentially.[6]  The statement "[i]f you have been contacted, please let Ruth or myself know" could be read as an optional request, which would have no bearing on an employee's decision to participate, or as a directive, which would.  Mucciarone asserts, and the Secretary disputes, that he did not expect employees to inform him if they had spoken with the DOL but did not feel comfortable disclosing that to him.[7]  [Def.'s SMF at ¶ 20].  The outcome of the retaliation

---

[6] Webb highlights the fact that, after the first mailing, Kruja provided Webb the names of the sixty employees she had sent contact letters to and the questions she had asked them.  [D's ADMF at ¶¶ 116-117].  Webb also helped set up interviews, many of which were conducted at its facilities.  [Id. at ¶¶ 108, 110-114].  At oral argument, Webb argued that this undermines the Secretary's claims that Webb's request to inform management in Mucciarone's emails was unlawful.  While relevant, Kruja's actions do not appear to have provided management with the contents of employees' responses or the names of individuals contacted in subsequent mailings.  Whether Kruja's disclosures undermined the confidentiality of employee participants in a manner that would have made Mucciarone's email requests irrelevant is a material fact in dispute.

[7] Defendant highlights the similarity of Mucciarone's emails to a letter sent in Walsh v. MedStaffers LLC, No. 1:21-CV-1730, 2021 WL 5505825, at *5 (M.D. Pa. Nov. 24, 2021) (finding FLSA retaliation claim based on letter advising employees interviewed by DOL investigators to "answer only the question that is asked, and wait for the next question" did not have a likelihood of success on the merits).  The analysis in MedStaffers does not persuade the Court here, as the contents of the emails have key differences. There was no language in the MedStaffers email

therefore turns on an assessment of Mucciarone's credibility, an evaluation of the relationship between Webb's management and employees, and an interpretation of how a reasonable employee would read the emails in light of their text and surrounding context.  A jury is best suited to fulfill that task.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Webb argues that the Secretary fails to provide sufficient evidence to conclude that employees found the challenged action materially adverse.  [Dkt. 61 at 10-15].  It points out that Kruja characterized the response rate after DOL's first set of mailings as "excellent" and that the response rate after the second set was lower but not noticeably low.  [Def.'s SMF at ¶ 15].  Additionally, it asserts that no evidence of any disciplinary action taken in response to an employee's participation has been offered either.  One employee reported that they saw the March 2019 email and were not concerned by it.  [Id. at ¶ 33].  Some of the circumstantial evidence indicating that the emails had a chilling effect, such as the deleted voicemails in Kruja's inbox, may ultimately be inadmissible at trial.[8]  [Id. at ¶¶ 24-29].  All of this information is relevant context about the impact the emails would have on a reasonable employee.  However, since the standard for determining adverse action is objective, such evidence is not necessarily required for the Secretary to prove their claim.  See Hashimoto v. Dalton, 118 F.3d 671, 676 (9th

---

that could be read as a directive telling employees to inform management about their participation and the information they shared.  Also, MedStaffers concerned a preliminary injunction and was therefore governed by a different legal standard; the court's decision therein was not intended to "say Secretary Walsh cannot prevail on his claims."  Id. at 7.

[8] Webb argues that Kruja deleting the voicemails, despite their importance, has prejudiced Webb and that references to the voicemails should be struck from the record as a sanction for the spoliation of evidence.  [Dkt. 61 at 15-16].  Since the Court's decision to deny Webb's motion for summary judgment is based instead on the emails themselves and their impact on a reasonable employee, it need not consider Kruja's subjective evidence about employees feeling dissuaded from participating.  The evidence may still be relevant at trial, and Webb may properly raise their objections to its admissibility in a motion in limine.

Cir. 1997) (holding that retaliatory action, even though it did not detrimentally impact employee, violated Title VII); EEOC v. L.B. Foster Co., 123 F.3d 746, 754 (3d Cir. 1997) ("An employer who retaliates can not escape liability merely because the retaliation falls short of its intended result.").

### 3. Causation

To establish the third element of causation, the Secretary must offer evidence "from which a reasonable factfinder could infer that the employer retaliated against [the employee] for engaging in the protected activity." Blackie v. State of Me., 75 F.3d 716, 723 (1st Cir. 1996). In other words, the Secretary must show that "but for" the employee's confidential participation in the investigation, the adverse action that Webb took, in this case the emails they sent, would not have occurred. See Kearney v. Town of Wareham, 316 F.3d 18, 24 (1st Cir. 2002) (applying "but for" causation standard for FLSA retaliation claim); but see Travers, 808 F.3d at 531 (applying "but for" causation while stating "we need not decide the precise standard of causation that a plaintiff must meet to prove unlawful retaliation" under FLSA claim).[9]

Since it is undisputed that Mucciarone's emails were sent to employees preparing to respond, or not, to the Secretary's mailings [Dkt. 65, Pl.'s SMF at ¶¶ 63-65, 67-68, 70-71], whether the Secretary can establish causation largely turns on whether the emails constituted adverse action. Since a genuine dispute exists on that issue, it is inappropriate to evaluate whether causation has been established.

Webb argues that no causal link is possible because they sent their emails in response to the DOL's ongoing outreach to Webb employees—not to chill employee participation. [Dkt. 61

---

[9] The First Circuit's guidance on the causation standard here leaves room for uncertainty, given its language in Travers. Travers, 808 F.3d at 531. However, given that here, as in Travers, the parties have agreed that the statute requires plaintiff to show "but-for" causation, the Court will evaluate the Secretary's claim under that standard. See id.; [Dkt. 64 at 24 n.12; Dkt. 61 at 16-17].

at 16].  The Court notes that Webb has already stated that one of the reasons they sent the emails

was to, among other factors, keep track of the employees who spoke with the DOL and to

ascertain the information supplied to the DOL by employees.  [Def.'s SMF at ¶ 19].  This would

clearly establish a causal connection between the employees' protected conduct and Defendant's

actions in response.  Webb may be able to prove that they would have taken their action

regardless, as part of their email response was allegedly motivated by other factors, such as to

clear up confusion among employees over the investigation.  [See D's ADMF at ¶ 120].  There is

a triable issue of fact as to whether that is the case.[10]

## IV.    CONCLUSION

For the above stated reasons, the Secretary's motion for summary is **GRANTED** as to

their claim that Webb violated the FLSA's overtime and recordkeeping requirements as alleged

in Counts One and Two of the Secretary's Complaint.  [Dkt. 1 at ¶¶ 61-65; Dkt. 63].  The Court

holds that

1.  Webb's Inside Sales Representatives ("ISRs") are not administratively exempt
    under the FLSA;

2.  Webb has failed to pay its ISRs the premium required by the FLSA for all
    overtime hours worked from August 4, 2018, to present; and

3.  Webb violated the recordkeeping requirements of the FLSA.

---

[10] Webb further argues that under the <u>McDonnell Douglas</u> burden shifting framework, the DOL cannot rebut their legitimate, non-retaliatory reasons for sending the emails.  [Dkt. 61 at 9, 17-19].  They assert that the emails were sent to help Webb defend itself in potential litigation, to advise employees of their rights, and to understand the scope of the DOL's investigation. [Id.].  Given the difficulty in ascertaining intent, the <u>McDonnell Douglas</u> framework exists to guide Courts analyzing discrimination claims when plaintiffs do not have a "smoking gun" evidence of a discriminatory motive.  <u>Velez v. Thermo King de Puerto Rico, Inc.</u>, 585 F.3d 441, 447 (1st Cir. 2009) (analyzing application of <u>McDonnell Douglas</u> framework to ADEA claim).  Under the framework, defendants offer legitimate, non-discriminatory reasons for their challenged actions and plaintiffs seek to demonstrate that the offered reasons were not the true reasons but were instead a "pretext" for discrimination.  <u>Id.</u> at 447-48.  When, as here, plaintiff's claim relies on direct evidence, there is no need for the Court to undergo that inquiry.  <u>Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.</u>, 999 F.3d 37, 50-52 (1st Cir. 2021) (describing when <u>McDonnell Douglas</u> applies and outlining examples of direct evidence).  The Secretary relies on the text of the emails and Webb's stated justifications for them, which should be considered "direct evidence."

Summary judgment for both parties is **DENIED** as to the Secretary's retaliation claim, as alleged in Count Three of the Secretary's Complaint.  [Dkt. 1 at ¶¶ 66-67; Dkt. 60; Dkt. 63].

     **SO ORDERED.**


Dated: June 16, 2023                    /s/ Angel Kelley_____
                                         Hon. Angel Kelley
                                         United States District Judge